THE STATE, JOHN BROWN prosecutor, *vs.* THE MAYOR AND COMMON COUNCIL OF THE CITY OF NEWARK.

1. The provisions of the act entitled, "An act for the relief of such portion of the militia of this state as may be called into service," approved May 11th, 1861, are not confined to such persons as, previous to the call of the president for troops, belonged to the organized militia of this state. The term "militia," as used in the act, applies to all persons by law liable to do military duty in the state, and all accepted by the state as such, whether previously resident here or not.

2. The provisions of the act, except the seventh section, apply to all the forces then raised or thereafter to be raised under state authority, whether for active service in the state or for the general government, in pursuance of the call of the president.

3. The seventh section of the act is entirely retrospective, and applies only to those who had been enrolled, reported to, and accepted by the governor before May 11th, 1861. The value of the rations furnished to the men by the state cannot be deducted from their pay under that section, nor are they entitled to pay for rations furnished by themselves.

4. The benefits of the act will not extend to any person who enlists in the regular army of the United States.

5. That part of the act which provides for paying the families and widowed mothers of volunteers applies only to those families and mothers who, at the time of the enlistment, have their permanent residence in this state, and not to those who reside elsewhere; nor does it apply to the family or mother of any volunteer who is mustered into the service of the United States in another state.

6. If the volunteer has no family or mother entitled to the $6 per month, he is entitled to the increased pay provided for in the fifth section.

State v. City of Newark.

*Certiorari* to set aside an ordinance passed by the common council of the city of Newark.

The facts fully appear in the opinion of the court.

Argued before the Chief Justice, and Justices OGDEN and VREDENBURGH.

*Frelinghuysen*, attorney-general, for the state.

*Bradley* and *Teese*, for the city.

The opinion of the court was delivered by

The CHIEF JUSTICE. This writ brings before the court an ordinance, to regulate the payments of money made under and in pursuance of the provisions of the act entitled, "An act for the relief of such portion of the militia of this state as may be called into service," approved May 11th, 1861.

As its title indicates, it is designed to carry into effect the provisions of the act. If the ordinance be broader in its scope than the act, it is so far void, and we must so declare.

It is understood that it was passed in its present shape to present to this court, for decision, certain questions, which the public interest requires to be settled now, to control the disbursement of the moneys required by the act to be paid for the relief of the troops organized by this state, and furnished to the federal government to aid in the suppression of the existing rebellion against the constitution and the Union, and the government established in pursuance of the one, for the maintenance and perpetuation of the other.

The ordinance provides that the sum of six dollars per month, authorized by the act referred to in the title, to be allowed and paid to the families of such persons of the militia of this state, and the widowed mothers of such persons, without families dependent upon them for support, as have been or shall be mustered into the service

of this state or the United States, shall be paid by the mayor of the city, or under his supervision or direction, to such families and dependent widowed mothers of the persons aforesaid, and that the provisions of the ordinance shall apply to the families and dependent widowed mothers of those who have been mustered into service under both the requisitions of the general government.

The first section of the act declares that the sum of six dollars per month be allowed and paid to the families of such married persons of the militia of this state, and to the widowed mothers of such persons without families dependent upon them for support, as have been or shall be mustered into the service of this state or the United States.

The second section provides that it shall be the duty of the board of chosen freeholders of each of the counties of this state to pay the said money monthly to such widowed mothers and to the families of such of the non-commissioned officers, musicians and privates as shall be mustered into the service of the state or the federal government.

The third and fourth sections relate to the mode of making the payment.

The fifth section declares that the pay of the non-commissioned officers, musicians and privates mustered into the service of this state or the United States from the militia of this state shall be increased at the rate of four dollars per month, and the State of New Jersey guarantees to each non-commissioned officer, musician and private, on his honorable discharge from the service of the state or the United States, the aforesaid sum of four dollars per month, in addition to the pay now allowed by law; provided that the United States shall increase the pay of such portion of the militia of this state mustered into the service of the United States, the State of New Jersey will allow and pay such amount to each non-commissioned officer, musician and private as shall make the said

increased pay equal to four dollars per month; and provided further, that said increased amount per month shall not be paid by the State of New Jersey to such portion of said militia as have been provided for in payment to their families by the provisions of this act.

The seventh section provides that those persons who have been enrolled into companies under the orders of the adjutant-general, and have reported themselves ready for service, and have been accepted by the governor, shall be paid at the rate of twelve dollars per month, the said payment to commence at the date of their acceptance, and to continue until they are mustered into service or discharged by the governor. The act was passed May 11th, 1861.

On the 15th of April, 1861, the federal government called upon the governor, under the act of congress for calling out the militia to execute the laws of the Union, suppress insurrection, repel invasion, &c., approved February 28th, 1795, immediately to detach from the militia of this state, to serve as infantry and riflemen for three months, unless sooner discharged, four regiments of 780 men each.

On the 3d of May, 1861, the president of the United States, by proclamation, called for a volunteer force to aid in enforcing the laws and suppression of insurrection, said force to be subject to the laws and regulations governing the army of the United States. The commissioned officers to be appointed by the governor.

The call last made was forwarded to the governor on the 16th of May.

Under the first call, the quota assigned to this state was four regiments; under the last, three.

Upon this statement of facts, it will be preceived that the last call for volunteers was made by proclamation eight days before the passage of the act in question, although the specific call on the governor was not made until after the passage of the act.

The ordinance provides for the payment of six dollars

per month to the families of the married persons of the militia of this state who have been mustered into service under both requisitions of the general government. The first question presented for decision is, whether the ordinance is valid to that effect.

No question is made but that the persons composing the four regiments mustered into the service are entitled to the payment, either to their families or themselves; but it is said that the persons composing the three regiments called for by the requisition of the 3d of May are not within the act, because they are not non-commissioned officers, musicians, and privates, mustered into the service of the state or the United States from the *militia of this state*; that they are not persons of the militia of this state.

What did the legislature mean by the term militia of this state?

It is manifest they did not mean to use the term in the narrow sense of persons liable to do military duty who had, prior to the first call of the president, been enrolled into uniform companies, and thus constituted, under the act of March 22d, 1860, entitled, "An act for the more effectual organization of the militia," the active militia.

The seventh section of the act plainly indicates such a construction of the act to be inadmissible. It speaks of persons who have been enrolled into companies under an order of the adjutant-general, and have reported themselves ready for service, and have been accepted by the governor, being paid at the rate of $12 per month, the payment to commence from the date of their acceptance, and to continue until they are mustered into service or discharged. This section obviously refers to persons who have volunteered and been enrolled into companies after the first requisition of the president. The troops were enlisted for this especial service.

The order of the adjutant-general was issued on the

17th of April, 1861, and called for four regiments, to be raised in the manner prescribed in the governor's proclamation of the same date, in which it is stated that, in compliance with the requisitions of the president, orders had been issued to the several generals of division to furnish each one regiment, and that they fill the regiments severally required to be furnished, as far as practicable, with volunteers, the regiments to be completed by a draft on the reserved militia; and he directed that all individuals or organizations willing to respond to the call thus made report themselves within twenty days from the date to the major-general's office in the respective divisions of which they reside. The captains of such companies as accept the invitation were, with their offer of service, to transmit a roll of their respective companies.

At the passage of the act the four regiments had been mustered into the service of the United States from this state: this is so stated in the eighth section of the act.

These facts show the mode in which the four regiments were organized; that this was done, as far as possible, by volunteer companies accepted by the governor.

I think it is clear that the legislature did not intend to draw any distinction between the volunteer militia which had been enrolled into uniformed companies before the call was made, and volunteers who, after the call was made, were under the authority of this state enrolled into companies, accepted by the governor and mustered into service. That is contrary, as we have seen, to the manifest meaning of the seventh section of the act providing for the payment of troops so enrolled and accepted. The effect of such a construction, holding such volunteers to be no part of the militia of this state, would be to deprive a large part of the four regiments furnished under the first call of the benefits of the act, and thus frustrate its acknowledged object; for it is well known that a large part of that force consisted of volunteers enrolled for that especial service, who tendered their services to the gov-

ernor by companies in the manner stated in the proclamation, were by him accepted and mustered into service ; men who never had constituted a part of the active militia, and never had been enrolled into the reserve under the act of March 22d, 1860.

That these men were entitled to the benefits of the act, although volunteers, is settled by the eighth section, which directs the adjutant-general to inform the several captains of the different companies forming the four regiments in service, of the passage of the act.

And the sixth section makes it the duty of the captain of every company of militia mustered into actual service to furnish a list of the names of every member of his company, designating whether married or single, and if single, whether having a mother dependent on them for support, and to file the same in the office of the clerk of the county in which such company was organized.

This section shows that all the members of the companies composing these four regiments were to be entitled to the benefits of the act, and is drawn upon the supposition that the men were enlisted for the special purpose by companies in different counties, and were not, before the call for troops, component parts of organized regiments constituting a part of the active militia.

If all the members of all the companies composing the four regiments were entitled to the benefits of the act, without reference to whether they had previously constituted a part of the active militia, or had volunteered by companies, and been accepted by the governor for the service, it seems to go very far towards showing the sense in which the legislature, in this act, use the term militia of this state, if it does not entirely settle the question. They intended to include in this term volunteers for the special service as well as previously organized militia.

The term militia was used in the act under consideration in the sense of all persons by law liable to do duty in the militia, in which, of course, are included all ac-

cepted by the state as such, whether previously resident here or not.

That is the definition of the term militia given in the act of March 22d, 1860.

By the first section of the act, the monthly payments are to be made to the families or widowed mothers, &c., of those *who have been* or *shall be* mustered into the service of this state or the United States. The eighth section states that the four regiments had been mustered into the service of the United States. It could not, then, have referred to them only, and not to the force about to be raised by the state under the proclamation already issued and known to the legislature. On that supposition, the words "as shall be mustered into the service of the United States" are without meaning.

It seems highly probable, if not absolutely clear, that these words " or shall be," &c., were inserted for the express purpose of making the act apply to the troops to be furnished to the president under his call of May 3d, for that made it evident he did not mean to call for any more three months' militia.

In construing this act, our object must be to ascertain the end the legislature had in view, the mischief to be remedied.

All the circumstances of the times at the passage of the act must be considered for that purpose.

If the active militia had been by power of law, by command of the governor, ordered to march to the defence of the capital, against the armed bands of rebels then threatening its capture, and thus had been compelled to leave their families without provision, it might have been a good reason why a distinction should be made in their behalf; why they should have the benefit to their families of six dollars a month extra, and that no such payment should be made to those who might afterwards, without compulsion, volunteer their services to carry on the war for the preservation of our government and the liberty it

secures to us.    But no such distinction can, consistently with the facts of history, be drawn.

The first four regiments who went into the field to the rescue of our national capital would be deprived of the just reward of their patriotism if stripped of their character of volunteers.    Their being volunteers did not deprive them of the bounty of the legislature.

The question is not to be settled by any arbitrary distinctions between volunteers enrolled in regiments under the authority of the state, and furnished on call of the president, as commander-in-chief of the army and navy of the United States and of the militia of the several states when called into the service of the United States, and the militia as enrolled under the ordinary operation of our militia system detached upon call of the president under the act of 1795.    By that act, the president could only call for *militia* to serve three months.    An order addressed to the governor to detail the militia to serve for three years would not have authorized him to command their services for that time.

The president, recognizing this great public emergency, and trusting to the patriotic impulses of the country so signally displayed upon his first proclamation, did all he could do, called on the governors of the states for volunteers to serve for three years, thirty-nine regiments of infantry and one of cavalry, not in pursuance of any existing law, but trusting to congress, called together for that purpose, for subsequent ratification.    He acted upon the great law of self-preservation, equally applicable to nations as individuals. The form of the call was determined by the emergency.    It was in name for volunteers, but in reality for the militia of the several states called on.

The force constitutes no part of the regular army.    Its officers are appointed by our state, not by the general government, for three years, and not for life or during the pleasure of the commander-in-chief.    It is not enlisted under the laws or authority of the United States, but by

state authority and under state laws, and at the expense of the state, until mustered into the service of the United States, subject to reimbursement. Until mustered into the service of the United States by consent of the governor, it is exclusively under state control. The governor is the commander-in-chief, and may direct all its movements.

I am satisfied that the legislature intended the provisions of the act should apply to all the military forces raised or to be raised in this state by state authority, whether to be retained in the active service of the state or turned over to the United States, in pursuance of the call of the president.

The constitution of this state knows of no other military forces to be raised under state authority, whether for its own service or that of the federal government, than the militia.

*Constitution, Art.* 7, § 1. The general government, by the president, can only call upon the states for *the militia;* it may raise and support armies by direct enlistment of men in the bounds of the state, and by appointing their officers. That is called the regular army of the United States. Troops furnished upon call of the president by the state are *militia;* by common usage they are so called; and in this sense the term was used in the act under consideration.

The benefits of the act would not enure to one of the militia, active or reserved, if he should enlist in the regular army of the United States.

The design of the legislature was not merely to compensate the three months' men for their services, but to hold out such inducements to volunteers to fill our regiments, called and to be called into service by the president, as would render a draft unnecessary, and enable this state promptly to do what has always been her chief pride and glory, perform its constitutional obligations to the Union in all their length and breadth, and enable it

to take part in this great struggle for the perpetuation of organized constitutional liberty with a force worthy to come from the most sacred battle-fields of the Revolution.

Since writing the above I have had my attention turned to the proclamation of the governor, issued upon the 2d of May last, which throws additional light upon this question, showing how, in point of fact, the three last regiments were organized, and the materials of which they are composed; that they are made up, in whole or in part, of companies who volunteered on the first call of the president.

In this proclamation the governor states that the four regiments called for were in the service of the United States, and that other companies had been organized, and had volunteered their services to the governor, sufficient to form several other additional regiments, which he had no authority to accept, as the president had made no further requisition, and he was not advised that another would be made, and that it was desirable that *the militia* of New Jersey, generally, should be in a state of preparation for any emergency that might arise; he therefore recommended that all volunteer companies then forming throughout the state, and all persons of the proper age disposed to do so, should organize themselves as volunteer companies, according to the act of 1860, as promptly as might be; so that there might be a large body of effective active militia in the state ready for any call that might be made upon them. This proclamation was before the legislature when the act was passed, and it is evident that the act was framed with reference to the facts stated in it.

The provisions of the act and the public acts of the government of the state show that the three last regiments were raised and organized substantially in the manner in which the first four were organized, out of volunteer companies who had tendered their services to the governor, been accepted and mustered into service, as a part of the

militia of the state, to answer the calls of the general government; and that the act was passed to answer the exigency which did arise after the issuing of the governor's proclamation, and before the date of the act, that is, the call for the additional regiments. The families and widowed mothers of those who have been mustered into service under both requisitions of the general government are entitled to the benefits of the first section.

The next question arising under the act is, what families and widowed mothers are entitled or intended to be provided for?

It is a general principle of construction that the operation of a general law for the relief of a particular class of persons, or persons answering a particular description, shall be confined to those of that description residing in this state. It will not be pretended that the legislature intended its bounty for those who are not subjects of our laws or entitled to their protection.

This state has always recognized its obligation to preserve from actual want its own citizens, but not those from other states.

If the state, by accepting the services of a volunteer having those dependent upon him for support residing in this state, and entitled to the protection of our law, deprives them of their ordinary means of subsistence, it is just that the state should contribute towards their support. This law was designed to recognize this obligation. The benefits of the law do not extend to families or mothers having their permanent residence in other states at the time of the enlistment of the volunteer.

Nor are the benefits of the first section designed for the families or mothers of those who have been mustered into the service of the United States in other states. When one belonging to the active or reserve militia of this state leaves it, and connects himself with a military organization in another state, he ceases to be of the militia of this state by his own act. He is not mustered into the ser-

vice of the United States as a citizen of New Jersey, one of its militia, but as one of the militia of the state where he is mustered in.

The ordinance is valid so far as it authorizes the payment of the six dollars per month to the families and dependent widowed mothers resident in this state of those who have been by this state mustered into the service of the United States, whether under the first or second requisition of the president, and is void so far as it authorizes the payment to be made to families or mothers residing out of this state, even when the volunteer enlisted and was mustered into the service of this state or the United States from this state and by its authority, or to families or mothers of those who have not been mustered into the service of this state, and by it into that of the United States.

The court was desired to express its opinion upon other points of doubt under this law, although not necessarily involved in the decision of this case.

We are of opinion—

1. That the seventh section of the act is entirely retrospective, not prospective; it applies only to those who had been enrolled, reported to, and accepted by the governor before the 11th of May, 1861.

2. That the value of the rations furnished by the state is not to be deducted from the pay of the men under that section, nor are the men entitled to the value of the rations where they furnished themselves. The law is silent upon that point, and the effect of that silence is to leave the state and the men as they are : neither is bound to account to the other. There was no contract, express or implied, by either.

The remarks that have been made upon the construction of the first section settles that of the fifth. They are correlative provisions, substitutes for one another. Where one operates, the other does not, and *vice versa*. They are both intended to operate upon the same subject mat-

ter, that is, the men mustered in under both requisitions and their families and dependent widowed mothers.

If the volunteer is entitled, as one of the militia of this state, but has no mother dependent or family resident in this state to get the benefit of the first section, he gets the increased pay by the terms of the fifth. If he does not get the increased pay, his family or mother, if resident in this state when he was mustered into the service of this state, get the six dollars per month.

CITED *in State* v. *Freeholders of Mercer Co.,* 5 *Dutch.* 299.